van Gestel, J.
This matter comes before the Court on two motions for summary judgment pursuant to Mass.R.Civ.P. Rule 56. The first filed motion is that of the individual defendants, U. Francis Fiorian (“Fior-ian”) and Myron S. Steere, III (“Steere”). The second filed motion is that of the remaining defendant, Morrison, Mahoney & Miller, LLP (“MM&M”). Since both motions raise many of the same issues, as do the oppositions to each, the motions will be discussed as if they were one, except where necessary to highlight issues specific to other than all defendants.
BACKGROUND
The facts that follow are not in dispute.
First Massachusetts Bank, N.A. was formerly known as Springfield Institution for Savings and then as SIS, a division of Family Bank, FSB. It now is part of Banknorth, N.A. Its evolution and iterations are not legally significant to this case and, therefore, it will be referred to herein simply as “the Bank.” The Bank is a federally chartered bank with a place of business in Worcester, Massachusetts.
At all material times, LADD Financial Group, Inc. (“LADD”) was a Massachusetts corporation with a principal place of business in West Springfield, Massachusetts. At all relevant times Fiorian was the president of LADD.
Also at all material times, New England Fidelity Insurance Company (“NEFIC”) was a domestic stock insurance company organized under the laws of the Commonwealth. Steere was the treasurer of NEFIC. LADD was the corporate parent of NEFIC, with LADD being said to wholly own NEFIC. NEFIC, in the fall of 2000, was declared insolvent by the Supreme Judicial Court, and the Commissioner of Insurance (the “Commissioner”) was appointed as its liquidating receiver.
In 1998, LADD sought to obtain funds through a loan from the Bank. The purpose of the transaction *214 was to provide LADD with funds which it, in turn, would contribute to NEFIC. The purpose for LADD contributing the borrowed funds to NEFIC was to enable NEFIC to satisfy certain statutory capital surplus requirements designed to protect its policyholders and creditors.
LADD sent the Bank a memorandum dated July 27, 1998, providing certain information regarding LADD and NEFIC, the proposed financing, the conservative accounting practices which insurance companies are statutorily required to follow, and the loan’s intended purpose. In connection with the loan’s purpose, the memorandum stated:
Funds, as may be required to protect capital requirements of NEFIC, would be downstreamed to NEFIC. Said funds would remain in the financing institution and invested in maximum interest-bearing term deposits.
Catherine DeBonis (“DeBonis”), an Assistant Vice President of the Bank, reviewed LADD’s memorandum and, in late 1998, prepared a written loan presentation for the Senior Loan Committee of the Bank. Her presentation contained a section entitled “AMOUNT/PURPOSE,” which read:
Approval of a $4,000,000 non-revolving line of credit, funds from which shall be down-streamed to NEFIC to help protect NEFIC’s statutory capital requirements relative to growth in underwriting. Advances shall be done on a guidance basis.
DeBonis’s presentation also contained a section entitled “COLLATERAL,” which read: “Pledge of 51% of the capital stock of any subsidiaries of the borrower.” The “borrower” was LADD.
DeBonis’s presentation was detailed and included, a section on “RISKS/MITIGATING FACTORS.” The first two paragraphs of this section described the principal risks for the Bank as follows:
The lack of personal guaranties creates an obvious risk to the Bank as it limits the ancillary repayment sources of the loan. Additionally, because of the nature of the security, it is difficult to determine what the value of the Bank’s collateral would be, especially in a liquidation scenario, which would require regulatory approval. The latter is further augmented by the fact that the Bank will have only a 51% pledge of the stock of NEFIC as collateral.
While the Bank would have to receive regulatory approval to sell the company in liquidation, it would like[ly] get this approval since the regulators are looking out for the best interests of the policyholders. From this perspective, the Bank’s bigger risk is that it would likely take 12 to 24 months to sell the company and be paid out such that the holding period for the Bank would be longer than preferred; however, this risk is minimized by the fact that the Bank would probably recover in full based on the selling value of the company.
DeBonis’s presentation indicated that the Bank would make money on the loan transaction in two ways: by charging interest on the money lent and by receiving fees for managing and investing the loan proceeds for NEFIC. Additionally, there would be an exit fee for the loan.
The Bank’s Loan Committee approved the loan on December 15, 1998. Thereafter, the Bank and LADD negotiated a commitment letter, and the Bank’s attorneys drafted a Credit Agreement. LADD was represented by Attorney Barnett D. Ovrut (“Mr. Ovrut”) at MM&M.
The final form of the commitment letter is dated January 6, 1999, and bears an acceptance on behalf of LADD Financial Group, Inc., by its treasurer Donald R. Dupre, dated February 3, 1999.
The Credit Agreement is dated as of March 18, 1999. It is a lengthy and detailed document, which, with exhibits, schedules and attachments, includes approximately 96 pages of single-spaced typing. The parties, and only signatories, to the Credit Agreement are LADD and the Bank. Florian signed for LADD as its president.
. Section 9.12 of the Credit Agreement is an integration clause. It reads:
This Agreement, the Capital Note, the Term Note and the Pledge Agreement set forth the entire agreement between the parties hereto relating to the transactions contemplated hereby and thereby supersede any prior oral or written statements or agreements with respect to such transactions.
Article 3 of the Credit Agreement is entitled “SECURITY.” The only security recited and described in Article 3 consists of (1) the Pledge Agreement, (2) stock certificates for 51% of the outstanding capital stock of NEFIC, and (3) the Financing Statements.
Section 5.15 of the Credit Agreement contains the following representation:
No authorization, consent, [or] approval... by any governmental or public body ... or any other Person, including without limitation, any Insurance Commissioner, is required to authorize, or is required in connection with the execution, delivery and performance by [LADD] of, or the legality, validity, binding effect or enforceability of, this Agreement or any other Loan Documents, except the consents . . . listed on Schedule 5.15 . . .
Section 5.22 of the Credit Agreement provides that LADD “shall use the proceeds of the Capital Loan solely to make surplus contributions to NEFIC.”
Section 6.14 of the Credit Agreement provides:
The Borrower [LADD] or NEFIC, as applicable, shall invest the proceeds of each Advance disbursed under the Capital Loan in interest-bearing term deposits or other low-risk marketable securities offered by the Bank or its Affiliates, in keeping with *215 the New England Fidelity Insurance Company Investment Policy and Guidelines attached as Schedule 6.14 and the requirements generally applicable to insurance companies under the laws of the Commonwealth of Massachusetts, and, so long as any Obligations remain outstanding to the Bank, shall maintain all such investments and all earnings therefrom on deposit with the Bank. So long as no Default or Event of Default exists hereunder, the Borrower or NEFIC, as the case may be, may withdraw from time to time any earnings on such investments.
The governing law, by Section 9.13 of the Credit Agreement, is the law of the Commonwealth of Massachusetts.
On February 16, 1999, Mr. Ovrut, on behalf of LADD and NEFIC, submitted to the Massachusetts Division of Insurance a Form D Prior Notice of Transaction (“Form D”). This form is required in connection with certain transactions by the provisions of G.L.c. 175, Sec. 206C(n). In the Form D the transaction is described as follows:
The transaction involves (i) a non-revolving line of credit provided by SIS, a Division of Family Bank, FSB (“SISBank”), Springfield, Massachusetts to LADD Financial in the amount of $4.0 million, the repayment of which is to be secured by a first priority pledge of 51% of the capital stock of New England Fidelity, and (ii) the investment by LADD Financial of amounts from the line of credit in New England Fidelity.
The Form D also explains that: “To secure its obligation to repay the amount that it is borrowing under the line of credit, LADD Financial will pledge as collateral for such loan 51% of the capital stock of New England Fidelity that is owned thereby.”
Neither the full Credit Agreement, nor any part thereof, particularly Section 6.14, was provided to the Division of Insurance when it was considering the Form D filing. Mr. Ovrut did, however, send by facsimile transmission a copy of the final and accepted form of the commitment letter to the Division of Insurance on February 17, 1999. In that letter, in Section 10, there appear, among other things, the following “covenants” which “shall” be included “in the loan agreement”:
(h) The proceeds of each advance disbursed under the Capital Loan shall be invested in interest-bearing term deposits or other low-risk marketable securities offered by the Bank, in keeping with New England Asset Management guidelines and the requirements generally applicable to insurance companies under the laws of the Commonwealth of Massachusetts; and
(i) For so long as any obligations of the Borrower under the Facility remain outstanding to the Bank, the Borrower and NEFIC shall maintain the Bank as their principal depository.
Also, on March 5, 1999, Mr. Ovrut sent to the Division of Insurance, by facsimile transmission, a full copy of the then most recent, but still marked-up, version of the Pledge Agreement, along with a copy of his March 2, 1999 letter to counsel for the Bank, suggesting two changes.
Included as part of Schedule 5.15 to the Credit Agreement is a copy of a letter from the Division of Insurance to Mr. Ovrut dated March 16, 1999, approving the transaction outlined in the Form D, as supplemented. Noted in the approval letter is the following limitation on the Bank:
The bank, SIS (a division of Family Bank, FSB), is prohibited from exercising its rights under Section 10 of the Pledge Agreement or any other agreement or instrument between the bank and LADD Financial in the event of any default by LADD Financial unless and until (i) the Bank has filed with the Commissioner of Insurance the statement required by Massachusetts General Laws chapter 175, Section 206B(a), and (ii) the Commissioner of Insurance has approved the acquisition of the shares of the capital stock of New England Fidelity Insurance Company that have been pledged as collateral for the repayment of the loan in accordance with Massachusetts General Laws chapter 175, Section 206B(d)(l).
As also required by Section 4.1(1) of the Credit Agreement, MM&M, by letter dated March 18, 1999, rendered a detailed opinion on behalf of LADD. In that letter, in a section numbered 12, MM&M opined as follows:
No authorization, consent, approval, order, license, form or permit, and no filing, registration or qualification with or exemption by any governmental or public body or authority, or any subdivision thereof, or any other Person under any subdivision thereof, or any other Person under any statute, regulation, rule, act or otherwise, including, without limitation, any order or ruling of any Insurance Commissioner, is required to authorize, or is required in connection with the execution, delivery and performance by LADD Financial of, or the legality, validity, binding effect or enforceability of, the Loan Documents, except (i) the execution, delivery, and performance of the Credit Agreement and the Loan Documents are, pursuant to the directive of the Commissioner, subject to the conditions and requirements set forth in Massachusetts General Laws chapter 175, Section 206C(n), which statute provides that certain transactions involving a domestic insurer may not be entered into unless the insurer has notified the Commissioner in writing of its intention to enter into such transaction at least thirty (30) days prior thereto and the Commissioner has not disapproved the *216 transaction within such period, such approval having been provided by letter dated March 16, 1999 and signed by Robert G. Dynan, CPA, Director of Financial Analysis and Licensing for the Massachusetts Division of Insurance, and (ii) the exercise by SIS of its remedies under Section 10 of the Pledge Agreement is subject to the conditions and requirements set forth in Massachusetts General Laws chapter 175, Section 206B, which statute provides that no person shall directly or indirectly acquire control of a domestic insurer or by conversion or exercise of any right to acquire be in control of a domestic insurer unless such person has filed a statement described in such statute with the Commissioner and the Commissioner has approved such transaction.
After execution of the Credit Agreement, LADD drew down an aggregate of $2.75 million on the line of credit. On each occasion, after the Bank disbursed the funds, they were transmitted by LADD to NEFIC and then placed by NEFIC in an account at the Bank opened pursuant to an Investment Management Agreement (the “Investment Agreement”) dated May 12, 1999. The only parties and signatories to the Investment Agreement are the Bank and NEFIC. Steere signed the Investment Agreement for NEFIC as its treasurer. The purpose of this agreement was to engage the Bank to manage the account for NEFIC consistent with certain agreed-upon investment guidelines.
The Investment Agreement in Section 4 recites: “The assets in the Account will be held for NEFIC by the Bank.”
Section 4 also provides that the Bank will provide NEFIC and General Re — New England Asset Manage-, ment, Inc. with monthly, quarterly and annual reports showing the results of its management of the Account and the Account’s performance. It is further provided that this information from the Bank, along with other from General Re — New England Asset Management, Inc., will be used “for purposes of reporting to [the] Massachusetts Division of Insurance . . . and any other regulatory agency requiring such reporting of investment data.”
By Section 12 of the Investment Agreement, it is made “subject to the terms, covenants and conditions of [the] Credit Agreement dated as of March 18, 1999 between LADD Financial Group, Inc . . . and the Bank.” Specific reference to Section 6.14 of the Credit Agreement is mentioned and “requires NEFIC to maintain the Account so long as LADD Financial Group, Inc. has any obligations outstanding with the Bank, the proceeds of which were advanced by the Bank and deposited in the Account.”
Included in Section 15 of the Investment Agreement is the following representation by NEFIC to the Bank: “No government authorizations, approvals, consents, or filings not already obtained are required in connection with the execution, delivery, or performance of this Agreement by NEFIC” and “the Account is subject to restriction on withdrawal of assets except for earnings on investments so long as the Credit Agreement as disclosed in Section 12, supra, remains outstanding.”
MM&M was not asked to advise or represent NEFIC in connection with the Investment Agreement. Indeed, Mr. Ovrut never saw the Investment Agreement until it was shown to him at his deposition in this case on February 13, 2003.
By the summer of 2000, NEFIC’s financial position was deteriorating rapidly. As a result, on September 14, 2000 the Bank cancelled the remaining line of credit under the Credit Agreement. NEFIC’s insolvency, and the Supreme Judicial Court’s appointment of the Commissioner as NEFIC’s liquidating receiver, followed shortly thereafter.
On December 6, 2000 the Commissioner requested that the Bank releas'e the funds in NEFIC’s investment account. After the Bank declined the request, the Commissioner brought suit in the Supreme Judicial Court for a judgment directing the Bank to turn over the investment account.
In the suit in the SJC, the Bank filed the third-parly complaint against Florian, Steere and MM&M that is presently before this Court.
In a settlement approved on August 2, 2002, by a Single Justice of the SJC,. the Bank paid the Commissioner $2.2 million in satisfaction of her claim. The details of the settlement have not otherwise been made available to this Court. Thereafter, the SJC remanded the third-party claims to this Court for resolution.
The Investment Agreement was not submitted to the Division of Insurance for approval under the Form D process, or any other.
DISCUSSION
Summary judgment is granted where there are no issues of genuine material fact, and the moving parties are entitled to judgment as a matter of law. Hakim v. Massachusetts Insurers’ Insolvency Fund, 424 Mass. 275, 281 (1997); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving parties bear the burden of affirmatively demonstrating that there is no triable issue of material fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989).
The individual defendants, Florian and Steele, have been sued for what is alleged to be negligent misrepresentation. The misrepresentations are said to come from representations in the Credit Agreement in Section 15.5 and the Investment Agreement in Section 15 as each relates to the statement that no government approvals, other than those already obtained, are required in connection with the execution and performance of the respective agreements. Florian and *217 Steele executed the agreements in their capacities as corporate officers.
MM&M is charged with negligence in issuing its March 18, 1999, opinion letter in connection with the Credit Agreement, particularly that portion in Section 12 regarding necessary government approvals quoted above.
Among other things, for there to be a misrepresentation on Florian’s or Steele’s part, or negligence on MM&M’s part, there must be some error in the statements, attributed to each, to the effect that no governmental approvals, other than those already obtained, were needed in connection with the execution and performance of the two agreements. This leads the Court first to the statutory provision relied upon by all parties, G.L.c. 175, Sec. 206C(n). Inmaterial part, this statute reads:
The following transactions involving a domestic insurer and any person in its holding company system may not be entered into unless the insurer has notified the commissioner in writing of its intention to enter into such transaction at least thirty days prior thereto, or such shorter period as the commissioner may permit, and the commissioner has not disapproved it within such period.
G.L.c. 175, Sec. 206 defines an “insurance holding company system” as consisting “of two or more affiliated persons, one or more of which is an insurer.” For the purposes of the present case, NEFIC and LADD constitute an insurance holding company system, with NEFIC being the insurer affiliated with LADD by virtue of LADD’s holding of NEFIC’s stock.
G.L.c. 175, Sec. 206C(n)(5) makes it clear that this statute is designed to protect against “any material transactions, specified by regulation, which the commissioner determines may adversely affect the interests of the insurer’s policyholders.”
In presenting the Form D materials to the Division of Insurance, MM&M only described that portion of the transaction in the Credit Agreement that ran between LADD and NEFIC — the parties to the insurance holding company system — and not that part of the credit Agreement that included the language of Section 6.14. Neither the Credit Agreement itself, nor the Investment Agreement, was ever presented to the Division of Insurance. At the outset, this Court must interpret both the statute and the language of the two agreements to determine whether approval of the Commissioner therefor was required for all or any parts thereof.
A statute must be interpreted according to the intent of the Legislature “ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished.” Hanlon v. Rollins, 286 Mass. 444, 447 (1934).
Rowley v. Massachusetts Electric Company, 438 Mass. 798, 802 (2003).
The object of G.L.c. 175, Sec. 206C(n) is to protect the interests of insurance policyholders. To that end, the statute, in impeccably clear language, regulates certain described transactions “involving a domestic insurer and any person in its holding company system.” Here, then, the situation revealed in the Credit Agreement insofar as it relates to LADD’s dealings with NEFIC may fall within the regulatory scheme. That situation involves the contemplated transactions in which LADD will provide funds to NEFIC to enable it to comply with its statutory surplus requirements, which funds LADD will borrow from the Bank and secure the borrowing with a pledge of 51% of NEFIC’s stock. This is what was revealed in the Form D presentation.
NEFIC, however, was not a party to the Credit Agreement. Thus, whatever may be the ultimate interpretation of the meaning of Section 6.14 thereof must be seen as between LADD and the Bank only. As such, sec. 206C(n) does not require prior notice to the Commissioner or her approval of Section 6.14. At the time leading up to the execution of the Credit Agreement, and thereafter, NEFIC was not a parly to that agreement. Thus, NEFIC, by the Credit Agreement, assumed no enforceable contractual obligations to the Bank. Consequently, neither Florian, the signatory— as president — on the Credit Agreement, nor MM&M, the provider of the opinion letter in connection with that agreement, can be said to have made the misrepresentation charged or acted negligently.
The Investment Agreement was executed nearly two months after the Credit Agreement. MM&M’s opinion letter was not rendered in connection therewith. For that reason alone, MM&M cannot be charged with negligence toward the Bank in connection with the Investment Agreement.
Further, the Investment Agreement was between NEFIC and the Bank, and there were no other parties thereto. The Bank is not “any person in [NEFIC’s] holding company system” and, therefore, it does not appear that the Investment Agreement was subject to G.L.c. 175, Sec. 206C(n)’s prior reporting requirement. Consequently, Steele, as signatory to the Investement Agreement, cannot be charged with misrepresenta-tion.
Should this Court be deemed in error in its interpretation of the reach of G.L.c. 175, Sec. 206C(n), the Bank’s claims still are without merit. This becomes apparent upon interpretation of the two agreements.
The interpretation of an unambiguous agreement is an issue of law for the Court. Contract language must be construed in its usual and ordinary sense. 116 Commonwealth Condominium Trust v. Aetna Cas. *218 & Surety Co., 433 Mass. 373, 376 (2001); Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998). A contract provision is ambiguous “only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.” Citation Ins. Co., at 381.
When an element of ambiguity does appear in a contract, the Court considers the entire instrument and the general scheme it reveals to determine the significance and meaning of the ambiguous terms. MacDonald v. Gough, 326 Mass. 93, 96 (1950). “The object of the court is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background and purpose.” USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116 (1989).
Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of a written contract. City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 720 (1999).
The particular part of Section 6.14 of the Credit Agreement, picked up in Section 12 of the Investment Agreement, which requires assessment reads: “so long as any Obligations remain outstanding to the Bank, [LADD or NEFIC, as applicable,] shall maintain all such investments and all earnings therefrom on deposit with the Bank.”
No facts are in dispute regarding this phrase. Further, all parties—LADD, NEFIC and the Bank — were in essential agreement as to the legal import of this phrase until such time that NEFIC sought to remove its funds from the Account at the Bank and the Bank consulted its lawyers for advice. It was then that the Bank, for the first time, read the words about maintaining the account differently than NEFIC and LADD. This may not necessarily present an ambiguity. The mere fact that parties disagree on the proper construction of contractual language does not necessarily establish ambiguity. Lumbermans Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995). Further, even in the case of an ambiguous agreement, interpretation is a matter of law for the Court except insofar as it may turn on facts in genuine dispute. Gross v. Prudential Ins. Co. of America, Inc., 48 Mass.App.Ct. 115, 119 (1999). There are no material facts in dispute here.
The Court must act in a way to give effect to the agreement as setting forth a rational business purpose to carry out the intent of the parties. Starr v. Fordham, 420 Mass. 178, 192 (1990). As noted, the agreed purpose for the borrowing under the Credit Agreement was to “help protect NEFIC’s statutory capital requirements relative to growth in underwriting.” Section 5.22 of the Credit Agreement specifically and clearly provides that LADD “shall use the proceeds of the Capital Loan solely to make surplus contributions to NEFIC.” And the only security for the loan recited in the Credit Agreement is the pledge by LADD of 51% of the NEFIC stock.
Massachusetts insurers are required by G.L.c. 175, Sec. 48 to maintain a certain amount of surplus, which has to be available to pay the claims of policyholders and creditors. “Surplus” is the “excess of admitted assets over the sum of capital and liabilities.” Id. Assets of an insurer must be “available for the payment of losses.” G.L.c. 175, Sec. 11. Rules dealing with capital and surplus are “designed to ensure the financial solvency of companies for the protection of policyholders.” G.L.c. 175, Sec. 48.
Considered in this context, the only reading of the language relating to maintaining the funds in the Account until all obligations of LADD to the Bank are satisfied which produces a rational business purpose to carry out the intent of the parties is that LADD and NEFIC must invest the proceeds of the loan in certain investment vehicles offered by or on behalf of the Bank, and that those investments and the earnings thereon must be kept on deposit at the Bank unless and until needed by NEFIC to meet its statutory surplus requirements.
The Bank’s contentions to the contrary — that it lent money to LADD to be used solely for NEFIC’s statutory surplus requirements, but the money cannot be used for statutory surplus requirements, until the entire loan is paid off by LADD — is certainly not a rational business transaction and, consequently, can not be an acceptable interpretation of either the Credit Agreement or the Investment Agreement. NEFIC and LADD hardly would have borrowed from the Bank money that could not be used and would have to be kept in the Bank until the borrowing was paid off, and have agreed to pay interest and investment fees to the Bank for the privilege. This is not rational; it makes no business sense; and it may violate the statutory provisions regarding surplus. It certainly cannot be sanctioned by this Court.
Given the determination that none of the defendants made misrepresentations or were negligent, the remaining claims, which are grounded thereon, must fail as well.
ORDER
For the foregoing reasons, among others, the motion for summary judgment of the individual defendants, U. Francis Florian and Myron S. Steere, III, and the motion of the remaining defendant, Morrison, Mahoney & Miller, LLP, is each ALLOWED. Judgment dismissing the third-party complaint shall issue accordingly.