van Gestel, Allan, J.
This matter comes before the Court after a jury-waived trial for findings of fact, rulings of law and an order for judgment. The case was remanded from the Appeals Court for further proceedings in accordance with its April 8, 2005, Memorandum and Order Pursuant to Rule 1:28, 63 Mass.App.Ct. 1110 (2005).
FINDINGS OF FACT
First Massachusetts Bank, N.A., formerly known as Springfield Institution for Savings and then as SIS, a division of Family Bank, FSB, is now part of Banknorth, N.A. Its evolution and iterations are not legally significant to this case and, therefore, it will be referred to herein for all purposes simply as “the Bank.” The Bank is a federally chartered bank with a place of business in Worcester, Massachusetts.
At all material times, LADD Financial Group, Inc. (“LADD”) was a Massachusetts corporation with a principal place of business in West Springfield, Massachusetts. At all relevant times U. Francis Florian (“Florian”) was the Chairman, President and CEO of LADD. LADD was organized for the purpose of establishing and funding New England Fidelity Insurance Company (“NEFIC”).
Also at all material times, NEFIC was a domestic stock insurance company organized under the laws of the Commonwealth. It offered a full line of personal insurance products, including automobile, homeowners and personal umbrella insurance and various commercial lines products.
Florian was President and CEO, and Myron S. Steere, Third (“Steere"), was at one time the Treasurer of NEFIC. LADD was the corporate parent of NEFIC, with LADD wholly owning NEFIC.
*549 In 1998, LADD sought to obtain funds through a loan from the Bank. The purpose of the loan transaction was to provide LADD with funds which it, in turn, would contribute to NEFIC. The purpose for LADD contributing the borrowed funds to NEFIC was to enable NEFIC to satisfy certain statutory capital surplus requirements designed to protect NEFIC’s policyholders and creditors.
LADD sent the Bank a memorandum dated July 27, 1998, providing certain information regarding LADD and NEFIC, the proposed financing, the conservative accounting practices which insurance companies are statutorily required to follow, and the Loan’s intended purpose. In connection with the loan’s purpose, the memorandum stated:
Funds, as may be required to protect capital requirements of NEFIC, would be downstreamed to NEFIC. Said funds would remain in the financing institution and invested in maximum interest-bearing term deposits.
Catherine DeBonis (“DeBonis”), an Assistant Vice President of the Bank, reviewed LADD’s memorandum and, on November 16, 1998, prepared a written “Loan Presentation” for the Senior Loan Committee of the Bank. Her presentation contained a section entitled “AMOUNT/PURPOSE,” which read:
Approval of a $4,000,000 non-revolving line of credit, funds from which shall be down-streamed to NEFIC to help protect NEFIC’s statutoiy capital requirements relative to growth in underwriting. Advances shall be done on a guidance basis.
DeBonis’s presentation also contained a section entitled “COLLATERAL,” which read: “Pledge of 51% of the capital stock of any subsidiaries of the borrower.” The “borrower” was LADD.
In a section entitled “ON-GOING COVENANTS,” DeBonis stated that
Funds from the line of credit shall be invested in interests bearing term deposits or other low-risk marketable securities at [the Bank] and remain in [the Bank]. Borrower and NEFIC to maintain [the Bank] as their principal depository.
In another section called “FINANCING REQUEST,” DeBonis advised that
LADD . . . has submitted a financing request for a $4,000,000 line of credit, proceeds of which will be down-streamed to NEFIC for statutoiy capital purposes. The Division of Insurance in the state of Massachusetts requires companies to adhere to statutoiy accounting practices, which are conservative and aimed at determining an insurance company’s capacity to satisfy its obligations to its creditors and policyholders in order to protect them from adverse loss situations.
DeBonis’s presentation was detailed and included a section on “RISKS/MITIGATING FACTORS.” The first two paragraphs of this section described the principal risks for the Bank as follows:
The lack of personal guaranties creates an obvious risk to the Bank as it limits the ancillary repayment sources of the loan. Additionally, because of the nature of the security, it is difficult to determine what the value of the Bank’s collateral would be, especially in a liquidation scenario, which would require regulatory approval. The latter is further augmented by the fact that the Bank will have only a 51% pledge of the stock of NEFIC as collateral.
While the Bank would have to receive regulatoiy approval to sell the company in liquidation, it would like[fy] get this approval since the regulators are looking out for the best interests of the policyholders. From this perspective, the Bank’s bigger risk is that it would likely take 12 to 24 months to sell the company and be paid out such that the holding period for the Bank would be longer than preferred; however, this risk is minimized by the fact that the Bank would probably recover in full based on the selling value of the company.
DeBonis’s presentation indicated that the Bank would make money on the loan transaction in two ways: by charging interest on the money lent and by receiving fees for managing and investing the loan proceeds for NEFIC. Additionally, there would be an exit fee for the loan.
The Bank’s Senior Loan Committee approved the loan on December 3, 1998.
The final form of a commitment letter is dated January 6, 1999, and bears an acceptance on behalf of LADD Financial Group, Inc., by its then Treasurer, Donald R. Dupre, dated February 3, 1999. Included in the commitment letter is a statement that: “The proceeds of the Capital Loan shall be used by the Borrower solely to make surplus contributions to NEFIC.”
Thereafter, with assistance from their attorneys, the Bank and LADD negotiated, and the Bank’s attorneys, Day, Berry & Howard, drafted, a credit agreement. LADD was represented in the process by Attorney Barnett D. Ovrut (“Mr. Ovrut”) at Morrison, Mahoney & Miller, LLP (“MM&M”).
The Credit Agreement (“Credit Agreement”) between LADD and the Bank is dated as of March 18, 1999. It is a lengthy and detailed document, which, with exhibits, schedules and attachments, includes approximately 88 pages of single-spaced typing. The parties, and only signatories, to the Credit Agreement are LADD and the Bank. Florian signed for LADD as its President.
In the Credit Agreement, the following, among many others, are defined terms:
“Minimum Statutoiy Capitalization” means the minimum amount of capital and surplus that NEFIC is required to maintain pursuant to the . *550 applicable laws of the Commonwealth of Massachusetts for the lines of insurance it is authorized to write.
“NAIC” means the National Association of Insurance Commissioners or any successor thereto.
“SAP” means the statutory accounting practices permitted or prescribed by the Insurance Commissioner for the preparation of annual statements and other financial reports by insurance corporations of the same iype as [NEFIC].
“SAP Financial Statements” means the financial statements of NEFIC, and any other insurance company Subsidiaries of the Borrower hereafter owned or acquired, which have been submitted or are required to be submitted to the Commissioner of Insurance.
“Statutoiy Surplus” means for any purpose, the surplus of NEFIC that appears, or should appear, on the SAP Financial Statements and is computed pursuant to the instructions of the NAIC. On the annual SAP Financial Statements form prescribed for the year ended 1998, such amount for the year ended December 31, 1998 appears on line 27, column (1) on page 3 thereof.
Section 9.12 of the Credit Agreement is an integration clause. It reads:
This Agreement, the Capital Note, the Term Note and the Pledge Agreement set forth the entire agreement between the parties hereto relating to the transactions contemplated hereby and thereby supersede any prior oral or written statements or agreements with respect to such transactions.
Article 3 of the Credit Agreement is entitled “SECURITY.” The only security recited and described in Article 3 consists of (1) the Pledge Agreement, (2) stock certificates for 51% of the outstanding capital stock of NEFIC, and (3) the Financing Statements.
Section 5.15 of the Credit Agreement contains the following representation:
No authorization, consent, [or] approval... by any governmental or public body or any other Person, including without limitation, any Insurance Commissioner, is required to authorize, or is required in connection with the execution, delivery and performance by [LADD] of, or the legality, validity, binding effect or enforceability of, this Agreement or any other Loan Documents, except the consents . . . listed on Schedule 5.15 . . .
Section 5.22 of the Credit Agreement provides that LADD “shall use the proceeds of the Capital Loan solely to make surplus contributions to NEFIC.”
Section 6.14 of the Credit Agreement provides:
The Borrower [LADD] or NEFIC, as applicable, shall invest the proceeds of each Advance disbursed under the Capital Loan in interest-bearing term deposits or other low-risk marketable securities offered by the Bank or its Affiliates, in keeping with the New England Fidelity Insurance Company Investment Policy and Guidelines attached as Schedule 6.14 and the requirements generally applicable to insurance companies under the laws of the Commonwealth of Massachusetts, and, so long as any Obligations remain outstanding to the Bank, shall maintain all such investments and all earnings therefrom on deposit with the Bank. So long as no Default or Event of Default exists hereunder, the Borrower or NEFIC, as the case may be, may withdraw from time to time any earnings on such investments.
The governing law, by Section 9.13 of the Credit Agreement, is the law of the Commonwealth of Massachusetts.
On February 16, 1999, Mr. Ovrut, on behalf of LADD and NEFIC, submitted to the Massachusetts Division of Insurance a Form D, Prior Notice ofTrans-action (“Form D”). This form is required by the provisions of G.L.c. 175, Sec. 206C(n) in connection with certain transactions. In the Form D the transaction involved is described as follows:
The transaction involves (i) a non-revolving line of credit provided by SIS, a Division of Family Bank, FSB (“SISBank”), Springfield, Massachusetts to LADD Financial in the amount of $4.0 million, the repayment of which is to be secured by a first priority pledge of 51% of the capital stock of New England Fidelity, and (ii) the investment by LADD Financial of amounts from the line of credit in New England Fidelity.
The Form D also explains that: “To secure its obligation to repay the amount that it is borrowing under the line of credit, LADD Financial will pledge as collateral for such loan 51% of the capital stock of New England Fidelity that is owned thereby."
Neither the full Credit Agreement, nor any part thereof, particularly Section 6.14, were provided to the Division of Insurance when it was considering the Form D filing. Mr. Ovrut did, however, send by facsimile transmission a copy of the final and accepted form of the commitment letter to the Division of Insurance on February 17, 1999. In that letter, in Section 10, there appear, among other things, the following “covenants” which “shall” be included “in the loan agreement”:
(h) The proceeds of each advance disbursed under the Capital Loan shall be invested in interest-bearing term deposits or other low-risk marketable securities offered by the Bank, in keeping with New England Asset Management guidelines and the requirements generally applicable to insurance companies under the laws of the Commonwealth of Massachusetts; and
(i) For so long as any obligations of the Borrower under the Facility remain outstanding to the Bank, *551 the Borrower and NEFIC shall maintain the Bank as their principal depository.
Also, on March 5, 1999, Mr. Ovrut sent to the Division of Insurance, by facsimile transmission, a full copy of the then most recent, but still marked-up, version of a Pledge Agreement, along with a copy of his March 2, 1999, letter to counsel for the Bank, suggesting two changes.
Included as part of Schedule 5.15 to the Credit Agreement is a copy of a letter from the Division of Insurance to Mr. Ovrut dated March 16, 1999, approving the transaction outlined in the Form D, as supplemented. Noted in the approval letter is the following limitation on the Bank:
The bank, SIS (a division of Family Bank, FSB), is prohibited from exercising its rights under Section 10 of the Pledge Agreement or any other agreement or instrument between the bank and LADD Financial in the event of any default by LADD Financial unless and until (i) the Bank has filed with the Commissioner of Insurance the statement required by Massachusetts General Laws chapter 175, section 206B(a), and (ii) the Commissioner of Insurance has approved the acquisition of the shares of the capital stock of New England Fidelity Insurance Company that have been pledged as collateral for the repayment of the loan in accordance with Massachusetts General Laws chapter 175, section 206B(d)(l).
As also required by Section 4.1(0 of the Credit Agreement, MM&M, by letter dated March 18, 1999, rendered a detailed opinion[2] on behalf of LADD. In that letter, in a paragraph numbered 12, MM&M opined as follows:
No authorization, consent, approval, order, license, form or permit, and no filing, registration or qualification with or exemption by any governmental or public body or authority, or any subdivision thereof, or any other Person under any subdivision thereof, or any other Person under any statute, regulation, rule, act or otherwise, including, without limitation, any order or ruling of any Insurance Commissioner, is required to authorize, or is required in connection with the execution, delivery and performance by LADD Financial of, or the legality, validity, binding effect or enforceability of, the Loan Documents, except (i) the execution, delivery, and performance of the Credit Agreement and the Loan Documents are, pursuant to the directive of the Commissioner, subject to the conditions and requirements set forth in Massachusetts General Laws chapter 175, section 206C(n), which statute provides that certain transactions involving a domestic insurer may not be entered into unless the insurer has notified the Commissioner in writing of its intention to enter into such transaction at least thirty (30) days prior thereto and the Commissioner has not disapproved the transaction within such period, such approval having been provided by letter dated March 16, 1999 and signed by Robert G. Dynan, CPA, Director of Financial Analysis and Licensing for the Massachusetts Division of Insurance, and (ii) the exercise by SIS of its remedies under Section 10 of the Pledge Agreement is subject to the conditions and requirements set forth in Massachusetts General Laws chapter 175, section 206B, which statute provides that no person shall directly or indirectly acquire control of a domestic insurer or by conversion or exercise of any right to acquire be in control of a domestic insurer unless such person has filed a statement described in such statute with the Commissioner and the Commissioner has approved such transaction.
After execution of the Credit Agreement, LADD drew down an aggregate of $2.75 million on the line of credit. On each occasion, after the Bank disbursed the funds, they were transmitted by LADD to NEFIC and then placed by NEFIC in an account at the Bank opened pursuant to an Investment Management Agreement (the “Investment Agreement”) dated May 12, 1999. The only parties and signatories to the Investment Agreement are the Bank and NEFIC. Steere signed the Investment Agreement for NEFIC as its Treasurer. The purpose of this agreement was to engage the Bank to manage the account for NEFIC consistent with certain agreed-upon investment guidelines.
The Investment Agreement in Section 4 recites: “The assets in the Account will be held for NEFIC by the Bank.”
Section 4 also provides that the Bank will provide NEFIC and General Re — New England Asset Management, Inc. with monthly, quarterly and annual reports showing the results of its management of the Account and the Account’s performance. It is further provided that this information from the Bank, along with other from General Re — New England Asset Management, Inc., will be used “for purposes of reporting to [the] Massachusetts Division of Insurance . . . and any other regulatory agency requiring such reporting of investment data.”
By Section 12 of the Investment Agreement, it is made “subject to the terms, covenants and conditions of [the] Credit Agreement dated as of March 18, 1999 between LADD Financial Group, Inc and the Bank.” Specific reference to Section 6.14 of the Credit Agreement is mentioned and “requires NEFIC to maintain the Account so long as LADD Financial Group, Inc. has any obligations outstanding with the Bank, the proceeds of which were advanced by the Bank and deposited in the Account.”
Included in Section 15 of the Investment Agreement is the following representation by NEFIC to the Bank: “No government authorizations, approvals, consents, or filings not already obtained are required in connec *552 tion with the execution, delivery, or performance of this Agreement by NEFIC” and “the Account is subject to restriction on withdrawal of assets except for earnings on investments so long as the Credit Agreement as disclosed in Section 12, supra, remains outstanding.”
MM&M was not asked to advise or represent NEFIC in connection with the Investment Agreement. Indeed, Mr. Ovrut never saw the Investment Agreement until it was shown to him at his deposition in this case on February 13, 2003.
The Investment Agreement was not submitted to the Division of Insurance for approval under the Form D process, or any other.
By the summer of 2000, NEFIC’s financial position was deteriorating rapidly. As a result, on September 14, 2000, the Bank cancelled the remaining line of credit under the Credit Agreement. NEFIC, in the fall of 2000, was declared insolvent by the Supreme Judicial Court, and the Commissioner of Insurance was appointed as its liquidating receiver.
On December 6, 2000, the Commissioner requested that the Bank release the funds in NEFIC’s investment account. After the Bank declined the request, the Commissioner brought suit in the Supreme Judicial Court for Suffolk County seeking a judgment directing the Bank to turn over the investment account.
In the suit before the SJC, the Bank filed the Third-Party Complaint against Florian, Steere and MM&M that is presently before this Court.
In a settlement approved by a Single Justice of the SJC on August 2, 2002, the Bank turned over to the Commissioner $2.2 million in satisfaction of her claim. The details of the settlement have not otherwise been made available to this Court. Thereafter, on a motion by the third-party defendants, the Single Justice sent the Third-Party claims to this Court for resolution. This Court, on appropriately supported motions, then granted summary judgment in favor of Florian, Steere and MM&M [16 Mass. L. Rptr. 213). As noted above, the Appeals Court, on April 5, 2005, reversed this Court’s decision and remanded the case for still further proceedings.
RULINGS OF LAW
The Court begins its rulings of law by reporting on certain conclusions of the Appeals Court in its Rule 1:28 Memorandum and Order.[3] In the posture of this case, the “duty of the Superior Court [is] ‘to follow implicitly the terms of the rescript and not to travel outside what. . . [was] there laid down.’ Bourbeau v. Whittaker, 265 Mass. 396, 399 [1929].” MacNeil Bros. v. State Realty Company of Boston, Inc., 350 Mass. 772 (1966). Consequently, this Court sets forth here certain sections from the Appeals Court’s Rule 1:28 Memorandum and Order — which appears to have all of the requisite trappings of a rescript — by which it feels bound and from which, if not so bound, it takes guidance.
We are satisfied that this level of involvement, for both LADD and NEFIC, brings the credit agreement’s withdrawal restrictions squarely within the purview of [G.L.c. 175] Sec. 206C(n), such that the restrictions should have been submitted for the commissioner’s approval.
Rule 1:28 Memorandum and Order, p.16.
Accordingly, we conclude that the representations by LADD, NEFIC, and the law firm, that all necessary approvals for the contemplated transactions had been obtained, were not accurate. Nevertheless, “[t]he defendant is subject to liability if, but only if, he has failed to exercise that degree of care or competence of a reasonable [person] in obtaining and communicating the information . . . The question is one for the juiy, unless the facts are so clear as to permit only one conclusion.”
Rule 1:28 Memorandum and Order, p. 17.
Among the genuine issues of material fact here are questions relating to whether the law firm acted negligently in seeking information from the commissioner’s office about the reporting requirements, in communicating with the commissioner’s office about the nature and specifics of the loan transaction, and in its interpretation of the relevant statute and regulations regarding the need for prior approval and the filing of form D.
Rule 1:28 Memorandum and Order, pp. 17-18.
Also to be considered are factual issues concerning whether Florian and Steere, who were themselves officers of entities within an insurance holding company system, were reasonable in making their representations and warranties to the bank. Consequently, whether the law firm and the individual defendants exercised reasonable care in making their assurances to the bank are questions we think better left to the fact finder.
Rule 1:28 Memorandum and Order, p. 18.
[BJecause the bank alleges negligent misrepresentation, not a breach of contract, we think the judge’s interpretation of the agreements is not determinative ... As we see it, the question for purposes of the bank’s negligent misrepresentation claim is not how we would construe the withdrawal provision as a matter of law, but whether the bank’s interpretation was reasonable in light of all the circumstances, rendering its reliance justified.
Rule 1:28 Memorandum and Order, p. 19.
Since we have determined that the withdrawal restrictions in the credit agreement and investment management agreement should have been disclosed to the commissioner under the applicable statute and regulations, the pivotal issue becomes whether the bank was justified in its reliance on the *553 defendants’ assurances regarding governmental approval of the transaction as meaning that the loan instruments’ withdrawal restrictions prohibited NEFIC’s use of the funds held at the bank, pending LADD’s repayment of the loan.
Rule 1:28 Memorandum and Order, p. 20.
The judge reasoned that NEFIC’s right to withdraw funds from the account to pay policyholders’ claims was implicit, given the stated purpose of the loan and the relevant insurance law. But also added to the mix, we think, was the reinsurance arrangement between NEFIC and General Reinsurance Corporation, a factor touted by LADD to the bank early on, when it first requested the loan. The reinsurance relationship, according to LADD, afforded “protection for NEFIC against high severity on individual losses and protection of its capital position.”
Rule 1:28 Memorandum and Order, p. 22.
In light of these various factors, we cannot say that the bank’s reliance on the defendants’ representations was unjustified as a matter of law.
Rule 1:28 Memorandum and Order, p. 24.
When an appellate court, as the Appeals Court has here, “reverse[s] the [summary] judgment on all counts of the plaintiffs third-party complaint and remandfs] for further proceedings in accordance with [its] memorandum and order,” and in the process proffers the several comments and determinations just quoted, as well as many more, and the parties then determine to proceed to trial jury-waived, this Court must pause and reflect on just what it is free to do and what has already been determined to be the law of this case and, therefore, beyond reconsideration. Much of what was quoted above relates to factual issues in dispute which this Court, now having heard and reviewed the evidence, and made credibility judgments, is obliged to rule upon afresh.
What this Court reads from the Rule 1:28 Memorandum and Order as untouchable legal conclusions are as follows:
1. The Credit Agreement’s withdrawal restrictions in Sec. 6.14 are squarely within the purview of G.L.c. 175, Sec. 206C(n), such that the restrictions should have been submitted for the commissioner’s approval; and
2. The representations by LADD, NEFIC, and the law firm, that all necessary approvals for the contemplated transactions had been obtained, were not accurate.
Even with the binding nature of the foregoing, however, there may be occasions hereafter in which aspects of the Credit Agreement, and perhaps other documents, that touch upon those issues needs resolution by this Court, either as matters of law or with the benefit of the factual presentations at the trial.
The Third-Parly Complaint, originally filed in the Supreme Judicial Court for Suffolk County, Docket No. SJ-2001-0155, contains five separate counts, as follows: Count I for negligent misrepresentation against Florian; Count II for negligent misrepresentation against Steere; Count III to reach and apply certain assets against Florian; Count IV for unfair and deceptive business practices under G.L.c. 93A, secs. 2 and 11 against Florian and Steere; and Count V for negligence against MM&M. Like the Appeals Court, this Court will treat Counts III and IV as dependent upon the primary claims in Counts I, II and V. See Memorandum and Order Pursuant to Rule 1:28, p. 1, n.2.
The individual defendants, Florian and Steere, have been sued for what are alleged to be negligent misrepresentations. The misrepresentations come from statements contained in the Credit Agreement in Section 5.15 executed by Florian, and contained in the Investment Agreement in Section 15 executed by Steere, as each relates to statements that no government approvals, other than those already obtained, are required in connection with the execution and performance of the respective agreements. Florian and Steere executed the respective agreements in their capacities as corporate officers, not individually.
MM&M is charged by the Bank with negligence in issuing its March 18, 1999, opinion letter in connection with the Credit Agreement, particularly that portion of the letter in paragraph 12 regarding necessary government approvals quoted above at p. 8.
At the heart of this case is a portion of Section 6.14 of the Credit Agreement, quoted above in full at p. 6 hereof. The portion on which the parties focus reads:
[S]o long as any Obligations remain outstanding to the Bank, [NEFIC] shall maintain all such investments and all earnings therefrom on deposit with the Bank. So long as no Default or Evént of Default exists hereunder, the Borrower or NEFIC, as the case may be, may withdraw from time to time any earnings on such investments.
At this point, this Court must again refer to comments by the Appeals Court in its Rule 1:28 Memorandum and Order. The following is taken from pp. 18-19.
The judge reasoned that, even were he in error in his ruling that no prior approval was needed for the transaction’s withdrawal restrictions, the bank still had no claim for misrepresentation or negligence because the withdrawal restrictions in the agreements could not reasonably be construed in a manner that would prevent the withdrawal of those funds for their intended purpose. Interpreting the credit agreement to effect a rational business purpose, the judge construed the withdrawal restrictions in furtherance of LADD’s overriding purpose in entering into the loan, which was to meet NEFIC’s *554 statutory surplus requirements, and thus have sufficient assets to pay policyholders’ claims.
But because the bank alleges negligent misrepresentation, not breach of contract, we think the judge’s interpretation of the agreements is not determinative, particularly in the summary judgment context. As we see it, the question for purposes of the bank’s negligent misrepresentation claim is not how we would construe the withdrawal provisions as a matter of law, but whether the bank’s interpretation was reasonable in light of all the circumstances, rendering its reliance justified. Again, we turn to the elements of the bank’s claim: “A defendant is liable for negligent misrepresentation if in the course of his business, he supplies false information for the guidance of others in their business transactions, causing and resulting in pecuniary loss to others by their justifiable reliance on the information, with failure to exercise reasonable care or competence in obtaining or communicating the information.” Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 59 n.25 (2004).
The misrepresentations attributed to MM&M here are focused solely on those statements in its March 18, 1999, opinion letter at paragraph 12, to the effect that:
No . . . approval... of an Insurance Commissioner, is required to authorize, or is required in connection' with the execution, delivery and performance by LADD ... of, or the legality, validity, binding effect or enforceability of, the Loan Documents, except (i) the execution, delivery and performance of the Credit Agreement and Loan Documents are, pursuant to directive of the Commissioner, subject to the conditions and requirements set forth in Massachusetts General Laws chapter 175, section 206C(n), which . . . provides that . . . the insurer has notified the Commissioner in writing of its intention to enter into such transaction at least... 30 days prior thereto and the Commissioner has not disapproved the transaction within such period, such approval having been provided by letter dated March 16, 1999 . . . by . . . the Division of Insurance, and (ii) the exercise by [the Bank] of its remedies under Section 10 of the Pledge Agreement is subject to the conditions and requirements set forth in . . . chapter 175, section 206B . . .
The misrepresentations charged to Florian and Steere here are focused solely on those statements in Section 5.15 of the Credit Agreement and Schedule 5.15 thereof, and Section 15 of the Investment Agreement, to the effect that no authorization, consent or approval of the Insurance Commissioner is required in connection with the execution, delivery and performance by LADD of, or the legality, validity and binding effect or enforceability of, the Loan Documents, other than the March 16, 1999, approval by the Commissioner.
The Court pauses here to inquire why Florian and Steere individually, as opposed to LADD and NEFIC as corporate entities, are being charged with these representations. Florian, in executing the Credit Agreement, and Steere, in executing the Investment Agreement, were each acting solely in their capacity as corporate officers. The representations were included in the two agreements. How can the corporate form be ignored in the circumstances presented? After all, “Massachusetts law provides the benefits of the corporate form to properly incorporated and operated business entities, and the courts should be expected to disregard that form only after a thorough assessment.” Ray-Tek Services, Inc. v. Parker, 64 Mass.App.Ct. 165, 177 (2005).
The particular statements in the Credit Agreement and the Investment Agreement that the Bank holds up as misrepresentations are not something that either Florian or Steere provided or necessarily would know about. As discussed more fully below, they were legal issues for which it would be entirely reasonable for them to rely upon counsel. See, e.g., Townsends, Inc. v. Beaupre, 47 Mass.App.Ct. 747, 753 (1999). Thus, this Court rules that Florian and Steere cannot be personally liable for the particular misrepresentations upon which the case against them is based.
An officer of a corporation does not incur personal liability for a tort committed by a corporation . . . merely by virtue of the office which he holds in the corporation ... As to third persons a corporate officer . . . cannot be held liable unless he commits a breach of a duty which he owes such person.
Refrigeration Discount Corp. v. Catino, 330 Mass. 230, 235-36 (1953).
Nothing in the evidence proffered in this case demonstrates any breach of a duty owed by Florian or Steere to the Bank in connection with the representations in the Credit Agreement or the Investment Agreement regarding the need for governmental approval.
The March 16, 1999, approval letter from the Division reads, in material part, as follows:
After a careful and thorough review of the Form “D” filed by [NEFIC] as well as follow-up documentation . . . the Division is ready to approve the filing subject to the following conditions: The bank, SIS . . . is prohibited from exercising its rights under Section 10 of the Pledge Agreement.or any other agreement or instrument between the bank and LADD ... in the event of any default by LADD ... of its financial obligation... unless and until (i) the Bank has filed with the Commissioner of Insurance the statement required by . . . chapter 175, section 206B(a), and (ii) the Commissioner . . . has approved the acquisition of the shares of the capital stock of [NEFIC] . . .
In order to assay whether there was negligence by either MM&M or negligent misrepresentations by Flor- *555 ian and Steere, the meaning of Section 6.14 of the Credit Agreement must be ascertained. This Court attempted to do so in its rulings on the summary judgment motions. Aside from stating that “the judge’s interpretation of the agreements is not determinative, particularly in the summary judgment context,” Rule 1:28 Memorandum and Order, p. 19, the Appeals Court itself made no attempt to construe the language of Section 6.14.
This Court reads the Appeals Court’s statement as suggesting two things, at least. First, that this Court’s interpretation is not determinative; not that it was wrong. Second, the Appeals Court appears to be giving some weight to the fact that the interpretation by this Court was “in the summary judgment context,” which adds to the basis for the statement that the ruling was not determinative. This Court reads the latter as suggesting a need for an evidentiary hearing of some sort, rather than as a statement that a trial judge should not make rulings of law on a summary judgment motion.
Respectfully, the meaning of Section 6.14 must be divined by this Court, perhaps with the aid of extrinsic evidence presented at trial, in order to make the key determination of whether Section 6.14 should have been presented to the Division of Insurance for approval. If Section 6.14 means what the Bank contends — that the monies on deposit cannot be withdrawn under any circumstance until the loan is paid off by LADD — then certainly it should have been presented to the Division of Insurance for approval. But, if Section 6.14 means what MM&M, Florian and Steere contend — that the monies are for statutory surplus requirements and, while they must remain on deposit with the Bank, they can, as they must, being surplus, be available for withdrawal to pay claims of policyholders when and if necessary — then it is far from clear that, as a matter of law, the Division had any authority to consider and disapprove the transaction because of that clause.[4]
A reader of these rulings is reminded that this case began, not with the Third-Party Complaint by the Bank, but rather by a Complaint against the Bank by the Insurance Commissioner, then standing in the shoes of NEFIC as its court-appointed permanent receiver. What the Commissioner sought from the Bank in her Complaint before the Single Justice was a release of the funds of NEFIC on deposit with the Bank for purposes of paying policyholders’ claims.
In order to understand the Commissioner/Receiver’s legal position before the Single Justice this Court quotes the following allegations in her Complaint.
15.The minimum capital and surplus requirements for insurers established by G.L.c. 175, Sec. 48, are intended to protect policyholders by requiring insurers to have a minimum level of assets available for the payment of claims. The statute defines “surplus” as “the excess of admitted assets over the sum of capital and liabilities.” G.L.c. 175, Sec. 48. The essential attribute of “admitted assets” is that they are “available for the payment of losses.” G.L.c. 175, Sec. 11. If the assets are not available for the payment of losses, they cannot be part of an insurer’s statutory surplus.
16. The Bank’s assertion of a right to withhold the funds in the Account is directly contrary to the purpose of the credit/surplus contribution transaction presented to the Division and as reflected in the Credit Agreement. Amounts that are so restricted are not admitted assets and cannot constitute statutory surplus as intended by the parties to the Credit Agreement.
17. A restriction permitting the Bank to withhold the funds in the Account is contrary to public policies, reflected in the statutes cited above, that admitted assets be available for payment of insurer obligations and that surplus consist of admitted assets.
18. On information and belief, the Bank was aware of and required the intended use of the funds as contributions to NEFIC’s statutory surplus. The Bank also was aware that the contributions enabled NEFIC to continue to meet the minimum capital and surplus requirements established by statute, that the requirement of minimum surplus is a measure to protect policyholders, and that the contributions would permit NEFIC to continue to write insurance.
19. In these circumstances, a restriction, not disclosed to the Division, permitting the Bank to withhold the funds in the Account is void as in violation of public policy. The Bank may not withhold the funds in the Account from the Receiver based on a restriction that is void and not enforceable.
While this Court does not have the benefit of a decision by the Single Justice on the Commissioner/Receiver’s Complaint that part of the case having settled before a decision, certainly the legal position then being advocated by the Commissioner/Receiver comports with the interpretations by MM&M, Florian and Steere as to the meaning of Section 6.14. Otherwise, it is difficult to comprehend how the Commissioner/Receiver could have any greater right to the funds on deposit with the Bank than would NEFIC.
For these reasons, this Court once again wades into the somewhat murky waters that swirl about Section 6.14.
At the beginning, this Court must determine whether Section 6.14, particularly the “withdrawal provision” thereof, is ambiguous. Can it be said that the withdrawal provision in Section 6.14 “is not ‘susceptible of more than one meaning,’ ” Prozinski v. Northeast Real Estate Services, LLC, 59 Mass.App.Ct. *556 599, 605 (2003), or must it be determined that neither “party’s interpretation of the [provision] commends itself to [the Court] to the exclusion of the other.” President and Fellows of Harvard College v. PECO Energy Company, 57 Mass.App.Ct. 888, 895 (2003).[5]
“Contract language is ambiguous ‘where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken.’ ” PECO Energy, supra, 57 Mass.App.Ct. at 896. “However, ‘an ambiguity is not created simply because a controversy exists between the parties, each favoring an interpretation contrary to the other’s.’ ” Suffolk Construction Company, Inc. v. Lanco Scaffolding Co., Inc., 47 Mass.App.Ct. 726, 729 (1999).
Once the contract is determined to be ambiguous, the court is free to look to extrinsic evidence ... in order to give a reasonable construction in light of the intention of the parties at the time of formation of the contract. . . When such evidence is considered, it may be that a logical answer consistent with the purpose of the agreements and the intentions of the parties will emerge.
. . . [H]owever, . . . this may be a question that the parties simply never considered. Should the trial court so determine, that does not frustrate a sensible resolution. “When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court... In these circumstances, the court does not base a decision upon evidence of prior negotiations or agreements, although such evidence may be admitted as bearing on what may be reasonable . .. ”[W]here there is in fact no agreement, the court should supply a term which comports with communiiy standards of fairness and policy rather than analyze a hypothetical model of the bargaining process.”
PECO Energy, supra, 57 Mass.App.Ct. at 896.
Not to be overlooked in this process, “(w]here knowledgeable and fully represented parties choose to embody their relationship in a carefully crafted document negotiated over several months, they are entitled to and should be held to the language they chose.” Cabot Corporation v. AVX Corporation, 448 Mass. 629, 638 (2007).
It is not the role of the court to alter the parties’ agreement. “Even if it be found that the contract, according to its true meaning . . . fails to become operative, it is not for the court, in order to give it operation, to suppose a meaning which the parties have not expressed . . .”
Rogaris v. Albert, 431 Mass. 833, 835 (2000).
This Court continues to adhere to its original conclusion that, under the circumstances involved and consistent with the purpose for the Credit Agreement, Section 6.14 is not susceptible to more than one meaning, and that one meaning is that the funds in issue must remain on deposit at the Bank, and must be managed by the Bank, unless and until they become needed to pay valid claims by NEFIC policyholders. The Court’s conclusions now have been bolstered substantially by the evidence presented at the trial.
The Bank knew, from at least as early as November 16, 1998, when its Senior Loan Committee considered the very thorough Loan Presentation by DeBonis, the Loan Officer assigned to the transaction, that the “AMOUNT/PURPOSE” for the loan was to provide a “non-revolving line of credit, funds from which shall be down-streamed to NEFIC to help protect NEFIC’s statutory capital requirements relative to growth in underwriting.”
The Bank further knew from its Loan Officer’s detailed report that “the Division of Insurance . . . requires companies to adhere to statutory accounting practices, which are conservative and aimed at determining an insurance company’s capacity to satisfy its obligations to its creditors and policyholders in order to protect them from adverse loss situations.”
The Senior Loan Committee was made fully aware of the various “RISK/MITIGATING FACTORS” in the loan that it approved on December 3, 1998. These included the fact that there would be no personal guaranties, that NEFIC was a start-up company, and that there would be no hard collateral. To offset this, and as the Bank’s sole security, would be the pledge of 51% of the capital stock of NEFIC.
A short time after the Senior Loan Committee approved the transaction, the Loan Officer, with assistance from others at the Bank and its outside counsel, Day, Berry & Howard, negotiated, prepared and issued a commitment letter, dated January 6, 1999, which was accepted by LADD on February 3, 1999. Again, the Bank’s commitment letter recited that “the proceeds of the Capital Loan shall be used by the Borrower solely to make surplus contributions to NEFIC.”
The Credit Agreement, executed on March 18, 1999, was not a casual document. It contains 88 pages of single-spaced typing, including various consents, approvals and schedules. The Credit Agreement was undoubtedly prepared by Day, Berry & Howard, the Bank’s outside counsel. Each page thereof bears a computer designation signifying that it is a Day, Berry & Howard generated document.[6]
As is often the case in a transaction between a borrower and a lender represented by sophisticated and experienced counsel, the actual negotiation of the ultimate agreement is relatively limited, with the lender usually holding the dominant position in the bargaining. There was no evidence of anything different in the transaction in issue here.
*557 The Court noted above at p. 5 just some of the many defined terms included in the Credit Agreement. Both the Bank, on the one hand, and LADD and NEFIC, on the other, cannot successfully feign a lack of understanding of the words they used and defined.
One of those defined terms, “Minimum Statutory Capitalization,” was said to mean “the minimum amount of capital and surplus that NEFIC is required to maintain pursuant to the applicable laws of the Commonwealth of Massachusetts for the lines of insurance it is authorized to write.”
Further, Section 5.22 of the Credit Agreement states that “the Borrower shall use the proceeds of the Capital Loan solely to make surplus contributions to NEFIC.”
As the Bank itself argues, the Credit Agreement contained a “tight” integration clause.
It was abundantly clear to this Court that DeB-onis, the Bank’s Loan Officer assigned to this transaction, who attested to having done the bulk of the work in preparing for the loan and its implementation, was fully and thoroughly aware of the purpose for the loan, knowing it to be for capital and that capital was related to premiums, and that surplus was to be used to pay policyholders. Further, she sufficiently understood the insurance accounting requirements that mandated a ratio between surplus and premiums such that premiums — business for an insurance company — could not grow unless surplus grew in tandem therewith. She also was quite familiar with the concept of re-insurance, and, in particular, with NEFIC’s re-insurance relationship with General Reinsurance Corporation.
The Bank’s Loan Officer did not view Section 6.14 as a form of collateral. The Credit Agreement itself, at Section 3.1, sets forth the items “to secure payment when due of the principal and interest under the Notes and other Obligations under” the agreement. They are: (a) the Pledge Agreement; (b) stock certificates representing 51% of the outstanding capital stock of NEFIC; and (c) the Financing Statements. No other security, of any kind, is included in the Credit Agreement.
A former Executive Vice-President of the Bank, who was a member of the Senior Loan Committee that approved this transaction, testified to his understanding that the insurance industry, like the banking industry, is highly regulated. He further stated his understanding that “capital for an insurance company is needed to protect policyholders, just like capital for a bank is needed to protect its depositors.”
The Bank, when it executed the Credit Agreement that included Section 6.14, knew more than sufficiently the nature of statutory surplus as it would be required and available to NEFIC. It cannot credibly be heard to say that it reasonably believed it could lend money to LADD, to be down-streamed to NEFIC for use as statutory surplus, but that money would not in fact be available for that purpose until the loan was paid-off by LADD.
Given the foregoing, this Court rules that it was not a misrepresentation for MM&M, Florian or Steere to state or represent that no further governmental approvals were necessary for the loan transaction in issue because Section 6.14 does nothing to interfere with the use of the funds on deposit for any appropriate statutory surplus purposes.
The foregoing notwithstanding, the Appeals Court has ruled that the Credit Agreement’s withdrawal restrictions in Section 6.14 are squarely within the purview of G.L.c. 175, Sec. 206C(n), such that the restrictions should have been submitted for the Commissioner’s approval; and that the representations by LADD, NEFIC, and MM&M, that all necessary approvals for the contemplated transactions had been obtained, were “not accurate.” That ruling simply may have been based upon the record then before the Appeals Court, without that court having the advantage of the facts now presented to this Court at trial. But then again, it may not. Consequently this Court now will proceed to further analyze this case as if the statements by MM&M, LADD and NEFIC that further governmental approval was not needed were, as the Appeals Court said, not accurate. To this Court, however, that statement by the Appeals Court only can have significance if the Bank’s current reading of Section 6.14 is correct, or, of course, if the Appeals Court itself, sub silentio, has made that interpretation.
In this analysis, the Court must focus on the law relating to negligent misrepresentation and negligence. Among other things, for there to be a negligent misrepresentation on Florian’s or Steere’s part, or negligence on MM&M’s part, there must be some error in the statements, attributed to each of them, to the effect that no governmental approvals, other than those already obtained, were needed in connection with the execution and performance of the two agreements.
As noted above, the Appeals Court has ruled on the record before it that the Credit Agreement’s withdrawal restriction in Section 6.14 are squarely within the purview of G.L.c. 175, Sec. 206C(n), such that the restriction should have been submitted for the Division’s approval; and the representations by LADD,[7] NEFIC, and MM&M, that all necessary approvals for the contemplated transactions had been obtained, were not accurate. This, of course, implies a determination — not spoken — that there is a restriction on withdrawals that has an effect on the use of the funds for statutory surplus purposes. In other words, that the provisions in Section 6.14 go beyond simply requiring that the deposits remain in the Bank and managed by the Bank until the loan *558 is paid off or until they are needed for the purpose for which they exist. Consequently, for purposes of this part of the rulings, representations that were not accurate are to have been made by LADD, NEFIC and MM&M.
The Appeals Court further has observed that the defendants are subject to liability if, but only if, they have failed to exercise that degree of care or competence of a reasonable person in obtaining and communicating the information in issue. This requires answering questions relating to whether MM&M acted negligently in seeking information from the Division about the reporting requirements, in communicating with the Division’s office about the nature and specifics of the loan transaction, and in its interpretation of the relevant statute and regulations regarding the need for prior approval and the filing of Form D. It also brings up for consideration whether Florian and Steere, who were themselves officers, and acting as such, of entities within an insurance holding company system, were reasonable in .making representations and warranties to the Bank.
After those issues are resolved, the Court still must focus on what the Appeals Court described as the “pivotal issue” of “whether the Bank was justified in its reliance on the defendants’ assurances regarding governmental approval of the transaction as meaning that the loan instruments’ withdrawal restrictions prohibited NEFIC’s use of the funds held at the bank, pending LADD’s repayment of the loan.”
The Court begins with MM&M’s approach to and dealings with the Division’s office that led up to MM&M’s March 18, 1999 opinion letter.
Given that Mr. Ovrut, the MM&M attorney in charge of the matter, did not read Section 6.14 as a limitation on NEFIC’s ability to withdraw funds from the account at the Bank for use as surplus to pay policyholders, his dealings with the Division of Insurance were not focused on Section 6.14 of the Credit Agreement. Rather, he was concerned about the provision in the Pledge Agreement that could result in the Bank foreclosing on the 51% of the capital stock of NEFIC. Consequently, the Form D, Prior Notice of Transaction, described the transaction as follows:
The transaction involves (i) a non-revolving line of credit provided by SIS to LADD Financial in the amount of $4.0 million, the repayment of which is to be secured by a first priority pledge of 51.0% of the capital stock of New England Fidelity, and (ii) the investment by LADD Financial of amounts from the line of credit in New England Fidelity.
The Deputy Commissioner for Financial Analysis, in the Division of Insurance, who rendered the approval decision for the Commissioner on the Form D before him clearly understood that the funds involved were to be used for statutory surplus. In his work on the Form D application he did not consider it with any thought that there was a question about statutory surplus “because it would be pointless otherwise.” In other words, the purpose for the loan, and the need of NEFIC, was to enhance statutory surplus. If there was a limit in the transaction which prevented the loan proceeds from being used for that surplus, there would be no point to the transaction and no need for a Form D notification. Thus, the Division focused on the capital contribution and the pledge of NEFIC stock as collateral, and that was all that it approved. It did not approve any particular document. More to the point the Division did not have before it the Credit Agreement and did not intend by its approval of the Form D to approve that agreement.
Given Mr. Ovrut’s interpretation of the meaning of Section 6.14, this Court would rule that his actions relating to the Division of Insurance with regard to the Form D that he filed were reasonable and proper in all essential respects. But, given the Appeals Court’s determination that Section 6.14 should have been provided to the Division of Insurance, this Court may not be free to make that ruling. Thus, the Court continues on with its analysis.
MM&M was not the Bank’s attorney, so this is not truly an attorney malpractice case. Nevertheless, under the principles elaborated in Nycal Corp. v. KPMG Peat Marwick, LLP, 426 Mass. 491, 495-96 (1998), MM&M is subject to liability to the Bank for pecuniary loss caused to it by its reliance upon the statements in the opinion letter, if MM&M, acting through one of its attorneys, failed to exercise reasonable care or competence in obtaining or communicating the information. If the information provided was “not accurate,” it is hard to say that counsel was exercising reasonable care and competence in communicating it to the Bank.
What this Court now must do is determine whether MM&M’s actions fell below the standard of care and skill of lawyers practicing in a field that includes the regulation of insurance companies. See, e.g., Williams v. Ely, 423 Mass. 467, 476 (1996): Fishman v. Brooks, 396 Mass. 643, 646 (1986).
The SJC in Williams, 423 Mass. at 476, sketched the situation as follows:
It does not matter that the opinion . . . was a reasonable view of the law . . . The problem is not that Gaston Snow gave reasonable advice that in time proved to be wrong. The problem is that the apparent certainty of the opinion given, at a time when the issue was not conclusively resolved, denied the plaintiffs the opportunity to assess the risk and to elect to follow alternative . . . options.
While not totally on point, the combination of the Nycal and Williams cases, leaves only one further determination to be made with regard to MM&M’s possible liability. That is the “pivotal issue” posed by the Appeals Court. Was the Bank justified in its reli *559 ance on the defendants’ assurances regarding governmental approval of the transaction as meaning that the loan instruments’ withdrawal restrictions prohibited NEFIC’s use of the funds held at the Bank, pending LADD’s repayment of the loan?
In order for there to be such liability the Bank must establish that it justifiably relied upon the information. In doing so, it is not enough to point to the end of the MM&M letter and see that it was intended to be relied upon by the Bank.
This brings the Court full circle back to the issue discussed above relating to the meaning of Section 6.14. Its meaning cannot wholly be avoided, and only this Court — as a Court or as the finder of fact — can make the determination of its meaning, at least in the first instance. The interpretation of an unambiguous agreement is an issue of law for the Court. Contract language must be construed in its usual and ordinary sense. 116 Commonwealth Condominium Trust v. Aetna Cas. & Surety Co., 433 Mass. 373, 376 (2001); Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998). “When the words of the contract are not ambiguous, the contract will be enforced according to its terms.” Mejia v. American Casualty Company, 55 Mass.App.Ct. 461, 465 (2002).
“The object of the court is to construe the contracts as a whole, in a reasonable and practical way, consistent with their language, background and purpose.” USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116 (1989). The Court must act in a way to give effect to the Credit Agreement and related documents as rational business instruments in order to carry out the intent of the parties. Starr v. Fordham, 420 Mass. 178, 192 (1990). Even in the case of an ambiguous agreement, interpretation is a matter of law for the Court except insofar as it may turn on facts in genuine dispute. Gross v. Prudential Ins. Co. of America, Inc., 48 Mass.App.Ct. 115, 119 (1999).
Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of written contracts. City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 720 (1999).
In construing the Credit Agreement, the Court must give effect to the intentions of the parties, as expressed in the language they employed, considered in the light of the context of the transaction and the purposes to be accomplished. Starr, 420 Mass. at 190; Shea v. Bay State Gas Co., 383 Mass. 218, 224-25 (1981).
Significantly, what the Appeals Court posits as pivotal is not reliance by the Bank on MM&M’s representation that no further approval by the Division of Insurance is needed to have the transaction be deemed approved, but rather, whether the Bank was reasonable in regarding, if it did, that the particular approval given by the Division meant that “the loan instruments’ withdrawal restrictions prohibited NEFIC’s use of the funds held at the bank, pending LADD’s repayment of the loan.”
The Court will not repeat again the history, and the knowledge by the Bank, of the purpose for the loan, although it relies thereon here, as well as above. Rather, the Court looks first at what it was that the Division of Insurance approved and what the Bank knew about it. The starting point is what it was that the Division was asked to act upon — the February 12, 1999, Form D, Prior Notice of a Transaction. The Form D was sent to the Division of Insurance on February 16, 1999. The Form D also was sent from MM&M, by facsimile, to Day, Berry & Howard, counsel for the Bank, on February 23, 1999. Thus, it was in the hands of the Bank’s attorneys almost a month before the execution of the Credit Agreement.
The Form D described the “transaction” as involving “(i) a non-revolving line of credit provided by SIS, a Division of Family Bank, FSB (’SISBank’), Springfield, Massachusetts to LADD Financial in the amount of $4.0 million, the repayment of which is to be secured by a first priority pledge of 51% of the capital stock of New England Fidelity, and (ii) the investment by LADD Financial of amounts from the line of credit in New England Fidelity.” The Form D makes no reference to Section 6.14 or anything about the withdrawal of the deposited funds, except by inference because they were to be used for statutory surplus purposes.
The Insurance Division’s approval of the Form D issued on March 16, 1999. That approval is attached as Schedule 5.15 to the Credit Agreement.
The MM&M opinion letter of March 18, 1999, in paragraph 8, makes specific reference to the Insurance Division’s “approval having been provided by letter dated March 16, 1999.”
The Bank and its counsel, therefore, knew exactly what the Insurance Division’s approval meant. They knew that it had nothing at all to do with Section 6.14 and the withdrawal clause.
Given the sophistication of the Bank and its counsel, and its thorough knowledge about and insistence upon the purpose for the loan, including an understanding of the legal reasons for which NEFIC required surplus, as well as the awareness of what was sought in the Form D, it should have been obvious to the Bank that the particular approval given here did not mean that “the loan instruments’ withdrawal restrictions prohibited NEFIC’s use of the funds held at the bank, pending LADD’s repayment of the loan.” See, e.g., Kuwaiti Danish Computer Co. v. Digital Equipment Corporation, 438 Mass. 459, 468 (2003); Mahoney v. John Hancock Mutual Life Insurance Company, 6 Mass.App.Ct. 919, 920 (1978).
*560 The Bank’s purported reliance upon the Insurance Division’s approval of the Form D here as being an approval of the withdrawal restriction of Section 6.14, which restriction if applicable, would wholly nullify the purpose for the loan, was not reasonable. “All that was required [of the Bank] was that [it read the Credit Agreement and the other documents setting forth the purpose of the loan against the Form D and its approval] to ascertain the obvious.” Kuwaiti Danish, 438 Mass. at 468. The Division of Insurance never approved the Bank’s interpretation of the withdrawal provision; it never even considered it.
The Bank “could not reasonably have understood or expected that the [withdrawal provision in Section 6.14] would be limited in such a manner” that NEFIC could not use the funds for the purpose of statutory surplus. See, e.g., Chokel v. Genzyme Corporation, 449 Mass. 272, 277 (2007). To do so would be to add a requirement to Section 6.14 that the parties did not include in the language they chose. Id.
The absence of reasonable reliance by the Bank seals its fate with regard to the negligence claim against MM&M, even if the other reasons recited above by this Court do not. That absence, of course, also seals the Bank’s fate against Florian and Steere, in addition to the rulings regarding them above and hereafter.
MM&M’s opinion letter of March 18, 1999, cannot in any conceivable way be held to include any representations regarding the May 12, 1999, Investment Management Agreement, a document never seen by MM&M. To be sure, the opinion letter speaks in sweeping language about things or documents that may arrive in the future or may be contemplated to arrive in the future. But any opinion regarding such documents cannot be considered a representation of facts. No liability arises for “[f]alse statements of opinion, of conditions to exist in the future, or matters promissory in nature.” Fogarty v. Van Loan, 344 Mass. 530, 532 (1962); Yerid v. Mason, 341 Mass. 527, 530 (1960). See also Liberty Leather Corp. v. Callum, 653 F.2d 694, 698 (1st Cir. 1981). A party cannot be held liable for an opinion of conditions to exist in the future, or matters it has never seen and knows nothing about.
The Court finally turns to the other question posed by the Appeals Court; were Florian and Steere reasonable in doing nothing more than rely solely on their counsel when executing the Credit Agreement and the Investment Agreement.[8] This Court rules that both Florian and Steere acted reasonably in relying upon counsel in signing the agreements containing the particular representations that are charged against each of them here. Townsends, Inc., 47 Mass.App.Ct. at 735. After all, those representations dealt with wholly legal determinations[9] and neither Florian nor Steere are attorneys. To be sure, they each were experienced in the insurance business. But the issues in question were not about the insurance business or about NEFIC’s business in particular, but rather about the need for seeking legal approval for the loan transaction from the Division of Insurance. As the history of this case has evolved, the answer to that question is quintessentially a legal matter, and one the answer to which was not readily apparent, even to this Court. Essentially, and in the circumstances they faced, Florian and Steere could do nothing but rely upon counsel’s interpretations. They acted reasonably in doing so, and for those reasons alone they cannot be found liable.
Given the foregoing, there is no legal basis for ruling in favor of the Bank on any of the counts of the Third-Party Complaint, including Counts III and IV not otherwise discussed.
ORDER FOR JUDGMENT
On the foregoing findings and rulings, judgment of dismissal in favor of the individual defendants, U. Francis Florian and Myron S. Steere, Third, and the remaining defendant, now known as Morrison, Mahoney, LLP, is ordered to be entered. Judgment dismissing the Third-Party Complaint shall issue accordingly.

The form of the opinion letter is substantially set forth in Exhibit D to the Credit Agreement.

Rule 1:28 is triggered when “a panel of the justices of [the Appeals Court] . . . determine[s] that no substantial question of law is presented by the appeal. . . and may, by its written order . . . reverse the action of the court below.” The “written order” here covers nearly 24 pages.

In this latter circumstance, it would seem, that the Division’s role would be only to make clear what the meaning of Section 6.14 must be in order to permit the transaction to proceed. Such a determination or statement, however, does not seem necessarily required for the transaction to be valid.

As these two cases reveal, this Court is not a stranger to this issue.

The Bank quibbles with this conclusion, suggesting that all that the designation means is that the documents on which it appears, as they were evolving, were “kept” on Day, Berry & Howard’s computer system. This Court has had far too much experience in and with maj or law firms representing sophisticated lending institutions not to recognize the weakness of the Bank’s contention here.

The representations of LADD, and those of NEFIC, are those covered in Counts I and II against Florian and Steere.

While MM&M gave no advice on the Investment Agreement, it did opine on the Credit Agreement, and the representations about the need for governmental approval are essentially the same in each.

Not all of the representations in the Credit Agreement and the Investment Agreement are limited to purely legal issues. But the only representations in issue here are those relating to the need for further governmental approvals, which are purely legal.